UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL WILLIAMS,

Plaintiff,

v.

PATELCO CREDIT UNION,

Defendant.

Case No. 24-cv-03464-LJC

**ORDER REGARDING MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 50

## I.   INTRODUCTION

Plaintiff Michael Williams brings this action against Defendant Patelco Credit Union under the Electronic Funds Transfer Act (EFTA).  Williams asserts that Patelco violated its obligations to reimburse him for unauthorized Automated Clearing House (ACH) transfers from his accounts and to conduct a reasonable investigation, among other requirements of the statute.  The case primary concerns a $4,500 transfer in November of 2023, though Williams also disputed other transfers from around the same time.  Patelco now moves for summary judgment.  The Court held a hearing on April 21, 2026.  Having considered the record and the parties' arguments, the Court DENIES Patelco's Motion for the reasons discussed below.[1]

## II.   BACKGROUND

### A.   Factual Overview

This evidentiary summary is included as context for the convenience of the reader, and is not a complete statement of potentially relevant evidence in the record that the Court has considered.  This summary is limited to evidence submitted with the parties' initial briefs; a

_____

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

United States District Court
Northern District of California

deposition taken after those briefs were filed is addressed in the context of the Court's analysis.[2]

According to Williams, on November 15, 2023, he identified an unauthorized November 13, 2023 transfer of $4,500 from his Patelco account to an account at another bank, which he had not linked to his Patelco account. *See* ECF No. 51-1 (Williams Decl.) ¶ 11. He reported that transaction to Patelco the same day and signed a DocuSign form related to the dispute. *Id.* ¶¶ 11, 13. When Patelco identified other transfers that occurred in October and November of 2023 related to external accounts that Williams did not recognize and had not linked, Williams disputed those as well. *Id.* ¶¶ 8, 11. Williams was "locked out" of his Patelco online account while Patelco investigated his dispute. *Id.* ¶ 15.[3]

Brian Cimarra, who is now a Patelco Fraud Data Analyst but held a different title at the time, determined the $4,500 transfer at issue "bore the hallmarks of Williams' ordinary, authorized account activity and was therefore not an 'unauthorized electronic fund transfer' under the EFTA." ECF No. 50-2 (Cimarra Decl.) ¶ 10. He relied on Patelco's technical logs, which he states showed that:

> the Disputed Transaction was verified through multi-factor authentication sent to Williams' email address on file; . . . the transaction originated from IP address 50.247.112.202, which had been regularly associated with Williams' account since at least June 2023; . . . that IP address was local to Williams and consistent with his prior account usage; and . . . , critically, Williams had previously initiated six undisputed ACH transfers to the very same Republic Bank & Trust external account in October and November 2023.

*Id.* ¶ 13; *see also id.* ¶¶ 17–25, 29–31.

Cimarra also states that "Williams affirmatively linked the Republic Account to his Patelco

---

[2] To the extent that this Order reconciles contradictory evidence or draws inferences, it does so in favor of Williams, consistent with the legal standard for resolution of Patelco's Motion for Summary Judgment. Nothing herein should be construed as resolving questions of fact that might be disputed at trial.

[3] Williams asserts that he received a letter dated November 30, 2023 from "Maximus Privacy Office" indicating that his personal information had been disclosed in a data breach several months earlier. ECF No. 51-1, ¶ 7 & Ex. B. The letter is likely inadmissible hearsay if offered for the truth off the matter asserted (that Williams's information was compromised), and there is no evidence that that Williams ever shared this letter with Patelco such that it could be relevant to the reasonableness of Patelco's conduct. The Court therefore disregards this letter for the purpose of this Order.

United States District Court
Northern District of California

Account . . . prior to the Disputed Transaction" and that the "device used to initiate the Disputed Transaction was designated as a 'Saved Machine' on Williams' Patelco Account prior to November 13, 2023," both of which required multi-factor authentication through Williams's email account. *Id.* ¶¶ 14–16, 25–27. Cimarra notes that the password for Williams's account was not changed around the time of the transfers at issue, and that there were no failed attempts to log into the account. *Id.* ¶ 28. Cimarra states that the IP address used to access the account for the $4,500 transfer and most of the other transfers to Republic Bank was associated with Comcast Cable Communications, an internet service provider that Williams had regularly paid from his Patelco accounts. *Id.* ¶¶ 2, 24, 25, 29, 30.

According to Cimarra, Williams did not allege that his Patelco banking credentials or his email account were compromised. *Id.* ¶¶ 33–35. Cimarra's declaration also includes statements about Williams's debit card usage, the relevance of which is not apparent when the debit card was not used for any of the disputed transfers. *Id.* ¶¶ 37–40.

Cimarra's January 20, 2026 declaration attached 39 pages of documents that Patelco had produced earlier in discovery and 178 pages of technical log files that Patelco only produced less than a week before serving that declaration, well after the close of discovery. *See id.* ¶¶ 4, 5 & Exs. A/1, B/2. Cimarra's declaration refers to those exhibits as Exhibits A and B, but their cover sheets identify them as Exhibits 1 and 2, so this Order refers to them Exhibits A/1 and B/2.

On December 1, 2023, a Patelco representative named Brian (presumably Cimarra) told Williams by telephone that his fraud claim was denied because Patelco determined that the $4,500 transfer was valid and authorized. ECF No. 51-1, ¶ 16; ECF No. 50-2, ¶ 11. Staff at a Patelco branch office also told Williams that the transfer had cleared and that his account was linked to multiple external accounts. ECF No. 51-1, ¶ 17. Williams filed a police report at Patelco's request. *Id.* ¶¶ 18–19 & Ex. D.

At some point after the investigation began, Williams noticed several DocuSign messages in his email account indicating that Williams had signed Patelco documents that he had not actually signed. ECF No. 51-1, ¶¶ 14, 20–21. Williams raised that issue with an employee at a Patelco branch around December 14, 2023 and requested copies of the documents, but never

received them.  *Id.* ¶¶ 22–23.

Williams sent Patelco a letter on December 29, 2023 again disputing the $4,500 transaction, as well as other related transactions, denying that he had linked an external accounts to his Patelco account, and requesting copies of documents related to Patelco's investigation.  ECF No. 51-1, ¶¶ 24–25 & Ex C.

On May 10, 2024, Williams received a letter from Patelco denying his dispute, which was dated March 22, 2024.  ECF No. 51-1, ¶¶ 26–27 & Ex. E.  That letter only referenced the $4,500 transfer, and stated the following reasons for denial:

- Activity was verified through multifactor authentication to your email address (MWB***24@OUTLOOK.COM) on November 13, 2023
- The IP associated with the transaction is established/regularly used on the account dating back to June 2023 (50.247.112.202 – Comcast Cable CA)
- The IP associated with the transaction is local to you
- The transaction activity on the account is established & had occurred for at least 1 month
- You transacted on the disputed funds in-branch[4]

ECF No. 50-2 at 8; ECF No. 51-1 at 32.[5]

According to a search that Williams conducted on the website WhatIsMyIPAddress.com on an unspecified date, the IP address at issue traced to San Francisco rather than to Williams's hometown of Antioch.  ECF No. 51-1, ¶¶ 4–5 & Ex. A.  Patelco never provided Williams with provisional credit for the $4,500 transaction while it conducted its investigation.  *Id.* ¶ 28.

### B.    Initial Briefing

#### 1.    Patelco's Motion

Patelco contends that it is entitled to summary judgment for two reasons: (1) the evidence shows that Williams himself authorized the $4,500 transaction at issue; and (2) even if he did not, Patelco conducted a reasonable investigation.  ECF No. 51-1 (Mot.)[6] at 7–8.

---

[4] Neither party has addressed this last point about Williams having "transacted on the disputed funds in-branch" or identified any evidence supporting it.

[5] Unless otherwise specified, citations herein to documents filed in the record refer to page numbers as assigned by the Court's ECF filing system.

[6] The first version of Patelco's present Motion included and relied on a Statement of Uncontroverted Fact in violation of Civil Local Rule 56-2.  *See* ECF No. 48.  Patelco filed the corrected version of its Motion now before the Court after the Court struck Patelco's first version

4

For its argument that Williams authorized the transaction, Patelco relies on the reasons for denial presented in Cimarra's declaration. *Id.* at 14–21. Patelco cites a case from the Northern District of Georgia where the court granted summary judgment based on evidence that Patelco characterizes as similar to the record here. *Id.* at 21–22 (citing *Royal v. J.P. Morgan Chase Bank, N.A.*, No. 4:22-CV-00250-WMR, 2024 WL 2164642 (N.D. Ga. Apr. 3, 2024)).

As for the sufficiency of its investigation, Patelco argues that it was only required to review its own records, and that it did so thoroughly. *Id.* at 22–24. Patelco also asserts that it had no obligation to conduct an investigation if the transfer was not, in fact, unauthorized. *Id.* at 24.

Patelco seeks to recover its attorneys' fees and costs based on Williams having brought this claim "in bad faith or for purposes of harassment." *Id.* at 25 (citing 15 U.S.C. § 1693m(f)). Patelco also briefly argues that the EFTA's "bona fide error" defense shields Patelco from liability here, but does not include any meaningful explanation of that defense or how it applies to the facts of this case. *Id.* at 25–26.

### 2.      Williams's Opposition Brief

Williams's opposition brief, which he filed one day too late, requested additional time and discovery under Rule 56(d) of the Federal Rules of Civil Procedure to respond to Patelco's untimely produced technical log. ECF No. 51 (Opp'n) at 9–10. As discussed below, the Court later granted that request.

Williams argues that the questions of whether the $4,500 transfer was authorized and whether Patelco conducted a reasonable investigation are for a jury to decide. ECF No. 51 at 13. With respect to authorization, Williams contends that his own declaration that he did not authorize the transfer creates a disputed issue of material fact, and that Patelco's circumstantial evidence to the contrary is not so clear as to warrant summary judgment. *Id.* at 14–16. With respect to reasonableness of the investigation, Williams contends that Patelco's log includes suspicious entries that Patelco seemingly failed to address, some of Patelco's reasons for denial (like that Williams did not dispute other transactions) are contradicted by evidence, and Patelco did not

---

sua sponte. *See* ECF No. 49.

United States District Court
Northern District of California

United States District Court
Northern District of California

investigate potentially relevant questions like who owned or controlled the recipient account(s), among other arguments. *Id.* at 16–22.

Williams also opposes Patelco's request for attorneys' fees, and contends that the "bona fide error" defense is inapplicable. *Id.* at 21–22.

### 3.    Patelco's Reply

Patelco contends in its reply that Williams's opposition brief should be stricken for having been filed late. ECF No. 52 (Reply) at 6. Patelco also objects to portions of Williams's declaration, both in its reply brief and in a separate document filed therewith. *Id.* at 6–8; ECF No. 52-1. The

The reply presents similar arguments to Patelco's motion regarding authorization and reasonableness, citing almost no evidence and little caselaw. ECF No. 52 at 9–15.[7]

### C.    Order to Show Cause and Supplemental Discovery

On February 11, 2026, the Court ordered Williams to show cause why his opposition brief should not be stricken as untimely filed, and ordered Patelco to show cause why its access logs should not be excluded under Rule 37(c)(1) of the Federal Rules of Procedure, or in the alternative, why further discovery should not be authorized under Rule 56(d) of the Federal Rules of Civil Procedure. ECF No. 53. The parties filed responses, ECF Nos. 54, 55, and the Court granted Williams's request to defer summary judgment and authorize further discovery, ECF No. 56.[8]

At a case management conference on February 19, 2026, "[t]he Court authorized further

---

[7] The reply asserts that a "plaintiff may not defeat summary judgment by asserting, in the abstract, that 'more investigation should have been done' without identifying what that investigation would have uncovered and how it would change the outcome," citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). ECF No. 52 at 13. The internally quoted language does not appear in *Celotex*, which addresses the standard for summary judgment rather than any degree of investigation necessary under the EFTA. The Court presumes that the inaccurate potential implication that this sentence quotes *Celotex* was unintentional.

[8] The record does not reflect a resolution of the Order to Show Cause with respect to Williams's day-late opposition brief. That Order to Show Cause is hereby DISCHARGED. Williams's counsel's delayed filing arose from excusable neglect, and the relatively mild prejudice to Patelco does not warrant the severe sanction of striking the brief when Williams's counsel's confusion ultimately traceable to Patelco's noncompliant original Motion for Summary Judgment that required correction and refiling.

discovery regarding Defendant's belatedly produced technical logs, to be completed by March 19, 2026." ECF No. 57. The Court directed the parties to file "supplemental brief[s] not exceeding six pages (exclusive of declarations and exhibits)." *Id.* Plaintiff deposed Cimarra, and the parties filed supplemental briefs, which are addressed in the Court's analysis below where relevant.

Counsel for both parties submitted "declarations" with their supplemental briefs that serve primarily to present arguments regarding other evidence, and sometimes regarding caselaw. ECF Nos. 59-1, 60-1. These are in effect additional briefs, exceeding the page limits that the Court previously ordered. Declarations are a means to present evidence, not to argue about it. *Cf. Farrow v. Contra Costa Cnty.*, No. 12-cv-06495-JCS, 2019 WL 78839, at *23 (N.D. Cal. Jan. 2, 2019) ("Where an 'expert report' amounts to written advocacy akin to a supplemental brief, a motion to strike is appropriate because this evidence is not useful." (cleaned up)), *aff'd*, 799 F. App'x 520 (9th Cir. 2020). If a party could submit unlimited additional arguments in the form of declarations, the page limits that courts routinely impose for briefing would serve no purpose.

This Order disregards both of these declarations on that basis, except to the extent that Williams's counsel's declaration serves as a vehicle to place Cimarra's deposition transcript in the record. To the extent that this Order's analysis of that deposition might overlap with arguments in either counsel's declaration, that is a coincidence based on the Court's independent review of the transcript. In an abundance of caution, however, the Court has reviewed Patelco's counsel's declaration and confirmed that it would not alter the outcome of the present Motion if considered.

## III.    LEGAL STANDARD

To prevail on a motion for summary judgment, a movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). At the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 630–31 (9th Cir. 1987). However, once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party

United States District Court
Northern District of California

resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

*Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).  The Court therefore draws all reasonable inferences in favor of Williams for the purpose of Patelco's motion for summary judgment.

On summary judgment, the Court must consider whether the *contents* of evidence offered by the parties would be admissible at trial, even if evidence is not currently offered in a *form* that would be admissible.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).

## IV.    ANALYSIS

### A.    Patelco's Objections to Evidence

Patelco filed a separate document with its Reply containing objections to portions of Williams's declaration.  ECF No. 52-1.  The Court strikes that document sua sponte as violating Civil Local Rule 7-3(c) ("Any evidentiary and procedural objections to the opposition must be contained within the reply brief or memorandum.").  Even if the Court considered the document, most of the objections stated therein lack any meaningful argument or analysis, and some of them appear to be frivolous.  For example, Patelco objects to Williams's statements regarding DocuSign notifications—that he received DocuSign email notices corresponding to Patelco documents he had not signed, raised that concern with Patelco, and requested copies of the documents, which Patelco did not provide, ECF No. 51-1 ¶¶ 20–23—"on the grounds that these statements lack proper foundation, are not based on personal knowledge, are not properly qualified expert opinion, and do not provide a proper basis for expert opinion."  ECF No. 52-1 at 2.  Williams may not be qualified to testify that any particular DocuSign notice in fact originated from Patelco, but the bulk of that portion of his declaration—Williams's experience reviewing his own emails and requesting documents from Patelco—is based on his personal knowledge and does not require any expert opinion.  This Order does not rely on the DocuSign notices having originated from Patelco.

To the extent that Patelco's Reply itself includes objections to portions of Williams's declaration, ECF No. 52 at 6–8, this Order does not rely on any statements therein that do not appear to be based on Williams's personal knowledge.

United States District Court
Northern District of California

United States District Court
Northern District of California

### B.  Patelco's Late-Produced Log

Williams contends in his supplemental brief that under Rule 37(c)(1) of the Federal Rules of Civil Procedure, Patelco cannot rely on its untimely produced technical log.  ECF No. 59 at 2–3.  That rule provides that when "a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  As the Court previously indicated in the Order to Show Cause, Patelco was required to include the log in its initial disclosures under Rule 26(a)(1)(A)(ii) many months before it ultimately produced the log, and Patelco has offered no persuasive justification for its failure to do so.  ECF No. 53 at 2–3.  In a footnote, Williams contends that the late disclosure was not harmless because Cimarra's failure to explain aspects of the log at his deposition leaves Williams in need of an expert witness to interpret it, and he does not have time to retain one.  ECF No. 59 at 4 n.4.[9]

Patelco's belated disclosure of this core data underlying its investigation long after the close of discovery was egregious, and the question of whether to exclude it is a close call.  At this point, however, the Court finds that the opportunity for supplemental discovery has mitigated the prejudice to Williams to the point that the belated disclosure is harmless for the purpose of Rule 37(c)(1).

Williams did not initially seek to exclude the log, instead asking only to defer summary judgment and allow further discovery under Rule 56(d), ECF No. 51 at 9–10, which the Court ultimately granted, ECF Nos. 56, 57.  When the Court proposed the current schedule for supplemental discovery and briefing at the February 19, 2026 case management conference, Williams's counsel Andrei Armas raised no concerns about the time available to conduct discovery regarding the log.  At that point, it had been more than a month since Patelco produced the log, *see* ECF No. 50-2, ¶ 5, and Armas had reviewed the log sufficiently to present relatively detailed arguments about it in his opposition brief, ECF No. 51 at 18–20.  It would have been

---

[9] The Court notes that the footnotes of Williams's briefs are presented in an extremely small font, in violation of Civil Local Rule 3-4(c)(2).  Williams's counsel is admonished to comply with that rule going forward.

United States District Court
Northern District of California

imprudent for Armas to assume that he would not wish to challenge any explanation or interpretation that Cimarra might provide for the log at the intended deposition. If Armas believed the log required expert interpretation and that the month that the Court allowed for supplemental discovery was not sufficient to retain an expert, the time for Armas to raise any need for additional time was at that case management conference, if not earlier. He did not do so.

Accordingly, having allowed Williams a period of time for supplemental discovery to which his counsel raised no objection, the Court finds that Patelco's belated production of the log is now "harmless" for the purpose of Rule 37(c)(1), and declines to exclude it.

That is not to say that the entirety of the log is sufficiently clear to a layperson that it is probative without clarification from someone knowledgeable about it, which might in some circumstances be a lay witness like Cimarra who worked with the log in his role at Patelco, or in other circumstances might require expert opinion evidence that neither party has procured. This Order generally only addresses the log to the extent that it was discussed and clarified at Cimarra's deposition. This Order does not reach the extent to which either party would be permitted to rely on the log at trial.

### C.    Cimarra's Credibility

Williams contends that the Court should disregard some or all of Cimarra's declaration because Cimarra contradicted it at his deposition. As Williams notes, Cimarra backed off from or was unable to substantiate a number of assertions in his declaration when he was deposed. Several examples follow.

Patelco's counsel at times objected to questions as outside the scope of supplemental discovery that the Court had authorized regarding Patelco's late-produced logs. The Court declines to disregard Cimarra's testimony on that basis, particularly where such testimony calls into question the accuracy of Cimarra's previous statements in his declaration. At trial, Williams's counsel is permitted to challenge Cimarra's credibility and question him about any relevant topics (to the extent allowed under the Federal Rules of Evidence), regardless of the supplemental deposition. There is no sound reason on summary judgment to disregard Cimarra's testimony, because doing so would risk granting summary judgment based on statements in

10

Cimarra's declaration that appear now to have been inaccurate.  That is not to excuse Williams's questionable decision not to depose Cimarra before the close of discovery, but now that the deposition has been taken, the Court will not turn a blind eye to relevant testimony, nor blithely rely on previous statements whose accuracy or truthfulness has been undermined.

### 1.    Knowledge of Policies, Procedures, and Records

Cimarra stated in his declaration that he was "familiar with the policies, procedures, and records relevant to the issues raised in this action," ECF No. 50-2, ¶ 2.  At his deposition, however, he testified as follows:

> Q. Okay. In paragraph 3 you state that you are "familiar with the policies, procedure and records relevant to the issues raised in this action." Do you see that?
>
> A. Yes.
>
> Q.  Which specific policies are you familiar with?
>
> A.  I can't tell you. Which, which ones are you interested in?
>
> Q.  The policies, procedures and records that are relevant to the issues raised in this action?
>
> A.  I'm sorry. I don't know how to answer this.
>
> Q.  When you, when you said you are familiar with the policies, procedures and records relevant to the issues raised in this action, what did you mean by that?
>
> A.  I meant that I am familiar with the case because I'm the one that originally reviewed it.
>
> Q.  Okay. And what policies and procedures did you review or are you familiar with regarding the case?
>
> A.  The policies? I do know that there is -- how do I say it? Like a terms and conditions box that pops up when you try to link an external account that Mr. Williams would have had to go through to link the account. Is that what you mean?
>
> Q.  I, I don't know what I mean because this is not my statement. This is your statement. So I'm trying to understand what you're familiar with; policies, procedures and records as you stated in this declaration.
>
> So I guess that was one of them. Is there anything -- any other policies or procedures that you're familiar with that is relevant to the issues raised in this action?

United States District Court
Northern District of California

A.   None come to mind at this moment, but if it comes up in the future I'll be sure to say it.

ECF No. 59-1 at 31–32 (Dep.[10] at 36:23–38:11).

When asked whether Patelco had a policy governing fraudulent transactions, Cimarra testified that was "likely" but he did not "know exactly what it's titled or where it is," then later that he had "seen it and read it" but could not recall whether he had reviewed it during the investigation.  *Id.* at 32 (Dep. at 38:12–39:10).  Cimarra did not know whether Patelco had a policy governing ACH transfers but said that any such policy would not "exist within [his] department," and he also did not know whether Patelco had a policy for handling EFTA or Regulation E[11] disputes.  *Id.* at 32–33 (Dep. at 39:11–41:19, 43:11–20).

When asked about the statement in his declaration that Patelco's policies only allow ACH transfers to external accounts where the Patelco accountholder is a signer, ECF No. 50-2, ¶ 41, Cimarra testified that Patelco "[g]enerally speaking, . . . would ask for bank statements," but ultimately did not know how Patelco determined whether the accountholder was a signer for the destination account.  ECF No. 59-1 at 51–52 (Dep. at 115:17–119:6).  Cimarra did not know what records might exist that would show Patelco verified Williams as a signer for the Republic Bank account that received the $4,500 transfer.  *Id.* at 52 (Dep. at 119:8–14).

### 2.   Authentication of Documents Produced

Cimarra stated in his declaration that Exhibits A/1 and B/2 thereto were "true and correct cop[ies] of Patelco's Document Production" and "Supplemental Document Production" in this litigation.  ECF No. 50-2, ¶ 4–5.[12]

At his deposition, Cimarra was not sure that he had seen the documents in Exhibit A/1 "as a compilation" before his deposition.  ECF No. 59-1 at 35 (Dep. at 50:25–51:5).  When asked how he knew they were "true and correct copies," Cimarra responded, "Because they look like any other like statement or online banking log or what have you."  *Id.* (Dep. at 52:13–20).  At the

---

[10] Cimarra's deposition is the only deposition transcript in the record before the Court.

[11] "Regulation E" is the implementing regulation for the EFTA.  *See Widjaja v. JPMorgan Chase Bank, N.A.*, 21 F.4th 579, 582 n.1 (9th Cir. 2021).

[12] As noted above, the declaration's exhibits were labeled as 1 and 2, but Cimarra referenced them as A and B.  Both parties seem to have understood that those paragraphs of Cimarra's declaration referred to the two exhibits attached thereto, which bear corresponding Bates numbers.

March 4, 2023 deposition, when Cimarra was shown a letter from Williams to Patelco that was included in Exhibit A/1 to Cimarra's January 20, 2026 declaration, Cimarra could not recall ever having seen it before. *Id.* at 43–44 (Dep. at 84:2–86:24).

There does not appear to be any dispute, at least at this juncture, that the documents attached to Cimarra's declaration are authentic. But a jury assessing credibility might reasonably consider Cimarra's willingness to attest to that without, apparently, knowing it to be true.

### 3.    Other Disputed Transactions

Cimarra stated in his declaration that "Williams does not dispute any of the Prior Republic Account Transfers," referencing a list of six transfers in the preceding paragraph. ECF No. 50-2, ¶¶ 16–17. At his deposition, Cimarra acknowledged that Williams's December 29, 2023 letter, which was attached to Cimarra's declaration, disputed some of those transactions. ECF No. 59-1 at 44 (Dep. at 87:25–88:3) ("Q. And in this letter Mr. Williams disputes those transactions? A. Yes.").

Cimarra went on to explain that Williams did not include those transactions in the dispute that he initially raised, and that Cimarra did not believe Williams submitted his subsequent letter to the correct department. *Id.* at 44–45 (Dep. at 88:13–90:22). Even crediting those portions of Cimarra's testimony, the statement in his declaration that "Williams does not dispute any of the Prior Republic Account Transfers" is not accurate, and is refuted by a letter attached to that declaration.

### 4.    Williams's Personal Conduct

At several points in his declaration, Cimarra attributes conduct taken using Williams's online Patelco account specifically to Williams:

- "Williams affirmatively linked the Republic Account to his Patelco Account . . . ." ECF No. 50-2, ¶ 14.
- "Patelco's records show that Williams received and entered a one-time passcode . . . ." *Id.* ¶ 16.
- ". . . Williams initiated six ACH transfers from his Patelco Account to the same Republic Account . . . ." *Id.* ¶ 17.

13

- "Williams used a device with the IP address 50.247.112.202 . . . ." *Id.* ¶ 23.

At his deposition, however, Cimarra repeatedly made clear that he did not conclusively determine that Williams took or authorized any of the actions made with his online account, and that it was not his role to make such determinations. For example:

> Q. So Patelco's not actually claiming it can prove Mr. Williams's [sic] personally did it; correct?
>
> [Objection]
>
> THE WITNESS: No, I can't make that determination. I can only see what I can see from the logs.

ECF No. 59-1 at 38 (Dep. at 62:14–24).

> Q. Is it your position that the claim was denied based on the logs themselves?
>
> A. Yes.
>
> Q. Did the logs themselves identify who actually, meaning a person, an individual, was making the transactions?
>
> MS. TOOR: Objection; calls for speculation.
>
> THE WITNESS: No.

*Id.* at 39 (Dep. at 66:2–10); *see also, e.g.*, *id.* at 40, 49 (Dep. at 70:22–71:3, 107:21–108:11).

That Cimarra himself did not or could not reach a conclusion that any particular conduct on Williams's account was actually done by Williams does not foreclose Patelco from arguing in this litigation that the evidence as a whole compels that conclusion, or at least that Williams had authorized someone to initiate the transfers at issue on his behalf. But a jury assessing Cimarra's credibility might reasonably take into account Cimarra's willingness to sign statements in his declaration asserting conduct by Williams that Cimarra was unwilling to corroborate at his deposition.

### 5. Timing of Saved Device

Cimarra stated in his declaration that the "device used to initiate the Disputed Transaction was designated as a 'Saved Machine' on Williams' Patelco Account prior to November 13, 2023." ECF No. 50-2, ¶ 26. At his deposition, however, he did not know when the device was saved to Williams's account, and could not identify a log entry confirming when that occurred or explain

United States District Court
Northern District of California

how to find that in the log.  ECF No. 59-1 at 47 (Dep. at 98:13–15); *see id.* at 47–49 (Dep. at 98:16–106:20).  When Williams's counsel identified a log entry that referred to adding a "trusted device" on (i.e., not "prior to") November 13, 2023, minutes before the $4,500 transfer, Cimarra was not sure whether that entry indicated that the device used for the transfer was saved to Williams's account on that date, and could not explain some of the technical language associated with that entry.  ECF No. 59-1 at 61–62 (Dep. at 154:21–161:4).

### 6.    A Jury Could Reasonably Question Cimarra's Credibility

Cimarra's declaration thus deviates from his subsequent sworn deposition testimony in several respects.  The Court need not and does not make any finding of malicious intent behind those inconsistencies.  One plausible explanation—among other possibilities—is that Cimarra genuinely believed that Williams likely authorized the transactions at issue, trusted that his employer and its attorneys would not ask him to sign false statements, did not pay close attention to what he was signing, and wanted to help.  Even so, his apparent willingness to make assertions under penalty of perjury that he seemingly did not consider in any detail or have personal knowledge to support calls into question whether a jury could rely on his testimony as having any probative value.

The Court's analysis below regarding the merits of Williams's claims therefore accepts that a reasonable jury might decline to credit Cimarra's declaration and deposition testimony, at least with respect to all but statements that both parties accept as true or that are most obviously supported by underlying evidence.

### D.    Limitation of Consumer Liability for Unauthorized Transactions

Congress enacted the EFTA in 1978 based on concerns that transactions processed electronically without human interaction were particularly subject to fraud.  *Widjaja v. JPMorgan Chase Bank, N.A.*, 21 F.4th 579, 580–81 (9th Cir. 2021).  The EFTA established consumer protections for such transactions that are "similar, but not identical" to preexisting law regarding unauthorized credit card charges.  *Id.* at 581 (citing 15 U.S.C. § 1643(a)).  Courts address the EFTA in conjunction with its implementing regulations, 12 C.F.R. part 1005 (previously 12 C.F.R. part 205), which are often referenced collectively as "Regulation E."  *See, e.g.*, *id.* at 582

15

n.1.

The EFTA provides that "in most instances a consumer's liability for an unauthorized transfer (or a series of related unauthorized transfers, *see* 12 C.F.R. § 1005.6(b)) may not exceed $50." *Widjaja*, 21 F.4th at 582 (citing 15 U.S.C § 1693g). "[T]he term 'unauthorized electronic fund transfer' means an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit," subject to certain exceptions. 15 U.S.C. § 1693a(12). Access to an account using credentials obtained through fraud is not "authorized." *Green v. Cap. One, N.A.*, 557 F. Supp. 3d 441, 448 (S.D.N.Y. 2021) (citing 2 C.F.R. § 205, Supp. I at 2(m)(2)). "In any action which involves a consumer's liability for an unauthorized electronic fund transfer, the burden of proof is upon the financial institution to show that the electronic fund transfer was authorized . . . ." 15 U.S.C. § 1693g(b). Williams's counsel clarified at the hearing that Williams only seeks to apply this limitation-of-liability provision to the November 13, 2023 transfer of $4,500, because he contends that the other purportedly unauthorized transfers involved funds that were deposited without Williams's knowledge or permission rather than Williams's own money.

The EFTA's limitation of a consumer's liability for unauthorized transfers "is subject to two exceptions." *Widjaja*, 21 F.4th at 582. The first is related to theft of access devices like ATM cards, which is not at issue in this case. *Id.* (citing 15 U.S.C. § 1693g(a); 12 C.F.R. § 1005.6(b)(2)). The second exception applies where a consumer fails to notify the bank of an unauthorized transfer within sixty days of receiving a bank statement showing an unauthorized transfer, but it only lifts the cap on a consumer's liability with respect to subsequent transactions beyond that sixty day period. *Id.* at 582–83 (citing 15 U.S.C. §§ 1693d(c), 1693g(a); 12 C.F.R. § 1005.6(b)(3), 12 C.F.R. pt. 1005, Supp. I, 6(b)(3) ¶ 1). That is therefore also not at issue here, because Williams states that he notified Patelco of the purportedly fraudulent $4,500 transfer two days after it occurred. ECF No. 51-1, ¶¶ 11, 13. Neither party addresses either of those exceptions, and Patelco does not assert that they apply.

Instead, Patelco argues that the evidence establishes that Williams authorized the transactions because: (1) the recipient account was linked to Williams's Patelco account by multi-

16

factor authentication through Williams's email account; (2) "Williams repeatedly used [the same] linked external account for prior transfers and did not dispute them"; (3) Williams's Patelco account was accessed using multi-factor authentication through Williams's email account to authorize the $4,500 transfer; (4) the IP address that accessed Williams's Patelco account for that transfer had been used to access his account before, starting in June 2023; (5) the device that accessed Williams's Patelco account to authorize the $4,500 transfer had been designated as a "saved machine" for the account, confirmed by multi-factor authentication through Williams's email address; (6) Patelco has a policy that only allows ACH transfers to external accounts where the Patelco accountholder is a signer; (7) Williams has not claimed that his email account or Patelco account credentials were compromised; and (9) the IP address used to access Williams's account for the $4,500 transfer was associated with Comcast Communications, the same internet service provider that Williams used.  ECF No. 50-1 at 17–21.

One of those purported facts is not true, at least when viewing the record in the light most favorable to Williams.  Contrary to Patelco's assertion (and Cimarra's declaration, ECF No. 50-2, ¶ 18) that Williams never disputed the other transfers to the recipient account, Williams states in his declaration that he told a Patelco representative named Brian (presumably Cimarra) that he never linked any external accounts, ECF No. 51-1, ¶ 16, and that in December of 2023 he "disput[ed] all related transactions occurring from October through November 15, 2023, including those Patelco identified to [him]," *id.* ¶ 24.  Patelco's own records include a letter that Williams submitted in December identifying certain other transactions from October and November 2023 as disputed, and asserting more generally that he "dispute[d] the unauthorized deposits and withdraws that were between [his] Patelco checking account and extern accounts during the month(s) of October and November 2023."  ECF No. 50-2 at 10 (Bates No. PCU000003).  That letter does not specifically list all of the other transactions with the account at Republic Bank, but viewed in the light most favorable to Williams, a jury might reasonably read it as disputing all such transfers to an account that Williams claimed he never linked.  At the very least, it specifically disputes some of those other transactions, not only the $4,500 transfer.

Cimarra's assertion that "Williams does not dispute *any* of the Prior Republic Account

17

Transfers" is thus simply false. ECF No. 50-2, ¶ 18 (emphasis added). As discussed above in the context of Cimarra's credibility, Cimarra's deposition testimony that Williams did not direct those disputes to the fraud department, even if credited, does not mean that Williams never disputed the transactions. Williams's letter specifically disputed several purportedly fraudulent transactions, and Patelco retained that letter in its records, was able to produce it in this litigation, and attached it to Cimarra's declaration. A reasonable jury could conclude that Williams disputed the other transfer at issue. Williams's failure to identify the other transactions when he first disputed the $4,500 transfer might raise questions, but any adverse inference that might be drawn from that is not appropriate in the context of Patelco's Motion for Summary Judgment.

Some of Patelco's other purported facts are not particularly probative. For one, the fact that Williams did not specifically assert a breach of his email account or his Patelco credentials—something that might have happened without Williams's knowledge—is not conclusive evidence that no such breach occurred. As another example, the Court takes judicial notice that Comcast is a prominent internet service provider, such that it would not be particularly surprising if someone besides Williams who accessed the account also used Comcast. *See* Fed. R. Evid. 201(b)(1).

Cimarra also recounted patterns of behavior that he associated with fraudulent transfers, like an unauthorized user usually withdraws funds immediately after gaining access. ECF No. 59-1 at 46 (Dep. at 94:20–95:12). According to Cimarra, that weighed against considering this transaction fraudulent when the IP address that was used to authorize it first accessed the account once in June of 2023 before authorizing several transfers in October and November. *See id.* (Dep. at 94:3–95:12). But Patelco has not offered Cimarra as an expert witness, nor is there evidence that Cimarra has particular expertise or training in patterns of fraudulent behavior. To use such behavioral profiling as evidence that the transactions at issue were authorized would likely require "specialized knowledge within the scope of Rule 702." *See* Fed. R. Evid. 701(c) (excluding such opinions by non-expert witnesses). Even assuming for the sake of argument that Cimarra's lay opinions were admissible, he offered little foundation for them, and a jury would not be required to credit his testimony on those subjects.

That leaves the following facts. Someone with access to Williams's Patelco account

18

credentials and email inbox for multi-factor authentication (or perhaps some way of bypassing those credentials) accessed Williams's Patelco account once in June and several times in October, and November of 2023, using (or perhaps spoofing) an IP address in the same geographic vicinity as Williams[13] and associated with the same common internet service provider. That person authorized multiple transfers to external accounts that had been linked to Williams's account at some unspecified time (perhaps during the same period of purportedly unauthorized access), using a device that was saved to Williams's Patelco account as a trusted access point (perhaps the same day as the $4,500 transfer). Williams initially identified only the $4,500 transfer as fraudulent, but when other transfers involving the same external account were brought to his attention, he disputed those as well.

Williams states in his declaration that he did not authorize any of the transactions or account linkages at issue—or in other words, that the person who engaged in the conduct described in the previous paragraph was not him or anyone he had authorized to do so. *See* ECF No. 51-1, ¶ 8. Williams also states that he received DocuSign notification emails pertaining to Patelco that he did not recognize as corresponding to anything he had authorized, which might support an inference of unauthorized access at least to his email account, regardless of whether the DocuSign notices actually originated from Patelco. *Id.* ¶ 14.

If a jury finds Williams credible, the jury might reasonably determine that someone else wrongfully gained access to his credentials for both his Patelco account and his email account. With respect to the Antioch-area Comcast IP address, the jury might determine that the perpetrator was a local acquaintance or relative of Williams who used the same large internet service provider, or a stranger coincidentally located nearby, or perhaps someone who was able to trick Patelco's systems into logging an IP address corresponding to a false location and service provider.[14]

---

[13] This Order assumes for the sake of argument that Cimarra's testimony identifying the IP address as located in or near Antioch—using an unspecified "website that is actually an aggregate of multiple IP websites" that "all said, for the Antioch area"—is admissible, ECF No. 59-1 at 41 (Dep. at 76:12–17), and that (as Patelco argues) Williams's declaration that he sourced the IP address to San Francisco is inadmissible as hearsay or as unqualified expert opinion. *See* ECF No. 52 at 6–7. It is not obvious that either side's IP address location evidence is admissible, at least for the purpose of proving where the IP address was actually located.

[14] Neither party has offered evidence of the reliability of Patelco's logging systems.

United States District Court
Northern District of California

Cimarra testified at his deposition that if someone besides Williams had logged into the account and had access to Williams's email account, Patelco's systems would have alerted Cimarra to differences in how that person used the system as compared to how Williams used the system. ECF No. 59-1 at 39–40 (Dep. at 69:13–70:21, 71:20–22). But Cimarra provided little explanation of the nature or reliability of that system, and a jury would not be required to credit that testimony (particularly in light of Cimarra's other inconsistencies) or to conclude that the lack of alerts from Patelco's unidentified monitoring system means Williams authorized the transactions.

Of course, a jury could alternatively determine that Williams is not credible, and that the circumstantial evidence presented by Patelco shows that Williams more likely than not authorized these transactions and lied about them under penalty of perjury. But that is factual dispute to be resolved at trial.

Patelco relies on the Northern District of Georgia's decision granting summary judgment for a defendant bank in *Royal v. J.P. Morgan Chase Bank, N.A.*, No. 4:22-CV-00250-WMR, 2024 WL 2164642, at *3 (N.D. Ga. Apr. 3, 2024). The evidence in that case overlapped to some degree with the facts here, but included somewhat clearer indicia of authorization. That case involved apparently undisputed facts that the pro se plaintiff made inconsistent statements about when she lost her credit card, transferred money between accounts to fund the disputed charges, received alerts about the transactions, confirmed the transactions in response to those alerts, and transferred money to someone she previously authorized transfers to, with no indication that she disputed the earlier transfers. It also involved confirmations through facial recognition on the plaintiff's smartphone. Assuming for the sake of argument that *Royal* was correctly decided, it does not compel the same result here, where virtually all of Patelco's evidence of authorization could be explained by an acquaintance of Williams having obtained his credentials for two accounts (his email account and his Patelco account).

Patelco suggests that denying this Motion would hold banks to an impossible standard, essentially requiring "a camera trained on its customers' keyboards" or some method to "biometrically confirm physical presence" when a customer authorizes a transaction. ECF No. 60 at 4–5. To no great credit, Williams's counsel has at times suggested that such direct proof is

necessary.  *See* ECF No. 59 at 6 ("More importantly, Cimarra admitted Patelco looks only at whether credentials were used, not who used them, and cannot determine from the logs whether Plaintiff personally made the transaction.").  The Court disagrees.  As a starting point, denying this Motion does not mean Williams necessarily prevails.  Even on the current record, Patelco might win at trial.  But it is also not hard to imagine how Patelco could have developed a more fulsome record during this litigation that might support summary judgment if—hypothetically—Williams in fact authorized the transfer.  Patelco could have served a subpoena on the recipient bank to identify the holder of the recipient account, and from there sought to determine what if any connection that person has to Williams.  (Even before litigation, Patelco could have consulted whatever records it used to verify that the external account complied with Patelco's ACH policy requiring Williams to be a signer, if any such records exist.)  Patelco could have served discovery requests on Williams seeking any records pertaining to Republic Bank.  Perhaps most obviously, Patelco could have deposed Williams to determine whether his denial of authorization withstands scrutiny under questioning.  At least based on the current record, there is no indication that Patelco did any of that.  Patelco's argument of impossibility rings hollow when it has seemingly done so little to develop the record.[15]

Patelco's Motion also seems to argue that even if the $4,500 transfer was not authorized, Patelco's investigation defeats liability for failure to reimburse that transfer under § 1693g.  ECF No. 50-1 at 22 ("Even if the Court were to assume Williams could raise a triable issue on authorization, Patelco still prevails because its investigation was reasonable under 15 U.S.C. § 1693f and Regulation E.").  Patelco backs off from that position in its Reply, characterizing the adequacy of its investigation as grounds for "summary judgment *on the separate theory* that Patelco's investigation violated the EFTA or Regulation E."  ECF No. 52 at 12 (emphasis added).  To the extent Patelco suggests that its investigation insulates it from liability under § 1693g, it cites no authority for such a defense, which runs counter to the text and structure of the EFTA.

---

[15] This is not to suggest that Williams was any more diligent in developing a factual record through discovery.  But this is Patelco's Motion for Summary Judgment, and Patelco also bears the underlying burden of proof on the issue of authorization.  15 U.S.C. § 1693g(b).

United States District Court
Northern District of California

Section 1693g imposes a duty on financial institutions to limit consumers' liability for unauthorized transfers. 15 U.S.C. § 1693g(a). Section 1693f imposes a separate duty to investigate consumers' reports of "errors," which include unauthorized transactions. 15 U.S.C. § 1693f(a). Nothing in § 1693f provides a defense to liability for violations of § 1693g. They are two separate theories of liability, and courts have addressed them as such. *See, e.g.*, *Green*, 557 F. Supp. 3d at 446–50 (not mentioning the defendant's investigation in the court's analysis of why a § 1693g claim should not be dismissed, before turning to the separate issue of the adequacy of the investigation for the purpose of a § 1693f claim). Patelco has not shown that its investigation can itself provide a defense to Williams's theory that Patelco violated § 1693g by holding him liable for an unauthorized transfer.

Accordingly, Patelco's Motion for Summary Judgment is DENIED as to Williams's theory that Patelco violated § 1693g.

### E.    Reasonableness of Patelco's Investigation

A separate provision of the ETFA, 15 U.S.C. § 1693f, requires financial institutions to conduct investigations after receiving a qualifying report from a consumer of an error by the financial institution. 15 U.S.C. § 1693f(a). One form of "error" that gives rise to that duty to investigate is "an unauthorized electronic fund transfer." *Id.* § 1693f(f)(1).

#### 1.    Patelco Had a Duty to Investigate

Patelco argues that it had no duty to investigate here because no unauthorized transfer occurred. ECF No. 50-1 at 24. At the hearing, Patelco's counsel relied vaguely on the text of the statute as only imposing a duty to investigate when a qualifying "error" has actually occurred, but did not identify any language that says as much. To the contrary, the text of the statute instead provides that a complaint setting forth "the consumer's *belief*" that an error occurred triggers a financial institution's duty to "investigate the *alleged* error." 15 U.S.C. § 1693f(a) (emphasis added). Patelco's position would also effectively nullify subpart (d) of the statute, which sets forth procedures a financial institution is required to follow if it "determines after its investigation pursuant to subsection (a) or (c) that an error did not occur." 15 U.S.C. § 1693f(d).

The cases Patelco cites in its Motion also do not support its position. In *Cook v. USAA*

*Federal Savings Bank*, the plaintiff's complaint did not set forth even his own belief in a qualifying error, because he only claimed that he had been induced through fraud to authorize a transfer, which would not be an "error" under the EFTA. *Cook*, No. 8:22-CV-01469-PX, 2023 WL 3949735, at \*2 (D. Md. June 12, 2023). In *Stephenson v. Navy Federal Credit Union*, which Patelco also cites without explanation, the court denied a motion to dismiss the plaintiff's EFTA claim. *Stephenson*, No. 23-CV-1851-WQH-KSC, 2024 WL 4257639, at \*6 (S.D. Cal. Sept. 20, 2024). This Court discerns no way in which that case could support Patelco's arguments or counsel in favor of dismissal here. Instead, courts have held "held that [a] bank's failure properly to fulfill the error resolution requirements was a violation of the statute, even though the bank had not committed the initial error of which [the customer] complained." *Berenson v. Nat'l Fin. Servs., LLC*, 403 F. Supp. 2d 133, 146 (D. Mass. 2005) (citing *Bisbey v. D.C. Nat'l Bank,* 793 F.2d 315, 317 (D.C. Cir. 1986)).

Patelco's legal premise that it had no duty to investigate is therefore incorrect. Even if that were not so, a reasonable jury could conclude that the transfer was unauthorized, as discussed above. Patelco is therefore not entitled to summary judgment on the basis that it had no duty to investigate.

### 2. A Jury Might Find Patelco's Investigation Unreasonable

The closer question is whether Patelco's investigation was sufficient. The Southern District of California has explained the standard for investigations as follows:

> Section 1693f offers little guidance on what constitutes a reasonable investigation of a properly reported error. However, Reg E provides that "a financial institution's review of its own records regarding an alleged error" satisfies § 1693f's investigation requirement if:
>
> > (i) The alleged error concerns a transfer to or from a third party; and
> >
> > (ii) There is no agreement between the institution and the third party for the type of electronic fund transfer involved.
>
> 12 C.F.R. § 1005.11(c)(4). The Official Interpretation of § 1005.11(c)(4) provides additional detail on financial institutions' investigative obligations under Reg E:
>
> > When there is no agreement between the institution and the third party for the type of [electronic fund transfer] involved,

23

the financial institution must review any relevant information within the institution's own records for the particular account to resolve the consumer's claim. The extent of the investigation required may vary depending on the facts and circumstances. However, a financial institution may not limit its investigation solely to the payment instructions where additional information within its own records pertaining to the particular account in question could help to resolve a consumer's claim.

12 C.F.R. § 1005, Supp. I at 11(c)(4) (Official Interpretation of § 1005.11(c)(4)). "[W]hen read in conjunction with the implementing regulations and Official Interpretation, § 1693f requires that any investigation under the statute include a *reasonable* review of the financial institution's own records." *Green*, 557 F. Supp. 3d at 450–51.

*In re Bank of Am. Cal. Unemployment Benefits Litig.*, 674 F. Supp. 3d 884, 911–12 (S.D. Cal. 2023) (emphasis added).[16]

Under that standard, a bank can rely on its own records to conduct its investigation. Even so, a jury could find that Patelco failed to review potentially relevant records in its own possession. Summary judgment is not appropriate if "a reasonable jury could conclude that [a bank's] heavy if not exclusive reliance on [certain evidence] did not constitute sufficient investigation because 'additional information within its own records pertaining to the particular account in question could help to resolve [the] claim,'" including a claimant's own explanations of relevant information. *Nguyen v. Wescom Cent. Credit Union*, No. SACV 22-01520-CJC (JDEx), 2023 WL 9019022, at *4 (C.D. Cal. Nov. 15, 2023) (quoting *In re Bank of Am.*, 674 F. Supp. 3d at 911–12).

Evidence in the record could support an inference that Patelco had additional information or records that it failed to consider. Cimarra testified, for example, that Patelco likely collected bank statements to verify that an accountholder was a signer on an external account to which they sought to transfer funds, but that he did not know whether Patelco had any records showing that the transfers from Williams's account complied with the policy requiring Williams to be a signer for the recipient account. ECF No. 59-1 at 51, 52 (Dep. at 117:2–9, 119:8–14). Williams also

---

[16] This order was later modified on reconsideration with respect to an unrelated holding regarding California's Unfair Competition Law. *In re Bank of Am. Cal. Unemployment Benefits Litig.*, No. 21MD2992-GPC(MSB), 2024 WL 3174380 (S.D. Cal. June 25, 2024).

United States District Court
Northern District of California

states that he disputed having any linked any accounts during an in-person visit to one of Patelco's branch offices, ECF No. 51-1, ¶ 16, and Cimarra testified that Patelco would keep records of disputes raised in that manner, ECF No 59-1 at 45 (Dep. at 92:23–93:10), but there is no such evidence in the record.  Viewing the record in the light most favorable to Williams, a jury that credited Williams's testimony might conclude that Patelco more likely than not had potentially relevant records regarding his in-person visits that it failed to review in its investigation.  To the extent that Patelco's own policies might have been relevant to Williams's dispute, Cimarra's lack of knowledge regarding such policies, and his inability to recall whether he reviewed Patelco's fraud policy, could also support an inference that he failed to consider relevant Patelco records when conducting the investigation.  *See* ECF No. 59-1 at 31–32 (Dep. at 36:23–41:19).[17]

There is also Williams's December 29, 2023 letter disputing several transfers.  ECF No. 51-1, ¶ 24 & Ex. C.  The record includes no indication that Patelco considered that letter before issuing its own letter denying Williams's claim as to the $4,500 transaction several months later.  *See id.* ¶¶ 26–27 & Ex. E.  A jury might decline to credit Cimarra's characterization of the December 1, 2023 telephone call as resolving the dispute.  Williams's declaration does not characterize it as such, and instead states that Cimarra simply told him the $4,500 transfer had "cleared" and external accounts were linked, which Williams denied having done, ECF No. 51-1, ¶ 16.  At least under those circumstances, the jury might conclude that Patelco's failure to consider the December 29, 2023 letter in its records before issuing its eventual written decision rendered Patelco's investigation insufficient.

Patelco misstates the holding of *In re Bank of America*, characterizing that as a case where a "bank satisfied its investigative duty under Regulation E by reviewing internal transaction data when no agreement existed between the bank and the third party involved in the disputed

---

[17] The Court need not resolve what if any inferences a jury might permissibly draw from potential irregularities in the technical log—like references to "impersonation" of Williams's account that Cimarra testified indicated authorized access by Patelco employees "logging into his online banking as admin," ECF No. 59-1 at 57 (Dep. at 138:25–139:12)—or an apparent reference in a bank statement to a different fraudulent transfer, ECF No. 50-2 at 26 (entry for "FRAUD EXT TFR" for a $3,999.53 deposit posted November 30 and effective November 15, 2023).   This Order does not reach the question of whether such evidence could also support a conclusion that the Patelco's investigation was insufficient.

United States District Court
Northern District of California

transfer." ECF No. 50-1 at 23. The specific page of that order that Patelco cites does not address investigative duties, but instead discusses qualifying errors. *In re Bank of Am.*, 674 F. Supp. 3d at 908. The portion of the order addressing investigative duties did not hold that the bank satisfied such duties, but instead denied the bank's motion to dismiss because the plaintiffs' allegations of rapid boilerplate denials, in conjunction with their allegations of fraudulent transfers, supported a reasonable inference that the bank failed to "review[] its own records in any meaningful way." *Id.* at 912–13.

Patelco also relies on the Northern District of Georgia's decision in *Royal*, ECF No. 50-1 at 24, but that case appears to have primarily relied on the court's finding "that the withdrawals at issue were authorized," and addressed the defendant's "thorough series of investigations" only in passing to reach that conclusion. *Royal,* 2024 WL 2164642, at *3. There is no indication that the same potential deficiencies in Patelco's investigation here were present in that case.

Patelco indisputably reviewed at least some internal records and technical data regarding the transfers at issue, and a jury might ultimately find that investigation to be reasonable. It is not clear, however, that a reasonable jury could reach no other conclusion on the present record. Patelco's Motion for Summary Judgment is therefore DENIED with respect to Williams's theory that Patelco failed to conduct a sufficient investigation as required by § 1693f(a).

### F.    Timely Notice and Provisional Credit

Section 1693f(a) requires a financial institution to "report or mail the results of [its] investigation and determination to the consumer within ten business days" of the dispute. 15 U.S.C. § 1693f(a). If the financial institution does not finish its investigation in that time, it may alternatively "provisionally recredit the consumer's account for the amount alleged to be in error" before the same ten-business-day deadline. *Id.* § 1693f(c). Williams asserts, and Patelco does not dispute, that Patelco did not provide provisional credit for the $4,500 transaction. ECF No. 51-1, ¶ 28.

Patelco contends that it was not required to provide Williams with provisional credit because it "advised Williams by phone on December 1, 2023 that the claim was denied." ECF No. 52 at 15. Williams states in his declaration that he submitted his dispute on November 15,

26

2023.  ECF No. 51-1, ¶¶ 11, 13.  Patelco offers no evidence to the contrary.  *See* ECF No. 50-2, ¶¶ 7–8 (Cimarra Decl., acknowledging Williams's allegation that he submitted a claim "on or about November 13, 2023" and asserting that Patelco thereafter "conducted an investigation").[18] Though not addressed by either party, ten business days after November 15, 2023 (accounting for the Thanksgiving holiday) was November 30, 2023.  Patelco's decision therefore appears to have come one day too late even if it occurred on December 1, 2023.  A jury that found Cimarra's characterization of the December 1 telephone call less than fully credible might also conclude on this record that Patelco did not reach a decision until it sent its letter in the spring of 2024 asserting that it had "concluded the re-investigation regarding" the dispute.  *See* ECF No. 50-2 at 8. Patelco is therefore not entitled to summary judgment on the question of whether it failed to provisionally credit Williams the value of the disputed transfer pending a decision on his claim.

Two other aspects of Patelco's decision, which the parties also have not addressed sufficiently, also potentially implicate violations of § 1693f's timeliness and provisional credit provisions.  First, Williams submitted a subsequent dispute addressing other transactions in addition to the $4,500 transfer on December 29, 2023.  ECF No. 50-2 at 10.  There is no indication that Patelco resolved that broader dispute within ten business days—or indeed ever, except for the $4,500 transfer.

Second, subpart (d) of the statute requires that when a "financial institution determines after its investigation pursuant to subsection (a) or (c) that an error did not occur, it shall *deliver or mail* to the consumer an explanation of its findings within 3 business days after the conclusion of its investigation."  15 U.S.C. § 1693f(d) (emphasis added).  Mere "oral notice" is "insufficient" to meet that obligation.  *Bisbey v. D.C. Nat'l Bank*, 793 F.2d 315, 317 (D.C. Cir. 1986); *see also Berenson v. Nat'l Fin. Servs., LLC*, 403 F. Supp. 2d 133, 146 (D. Mass. 2005) (citing and following *Bisbey*).  Patelco identified no authority to the contrary in its briefing or at the hearing,

---

[18] Patelco's eventual denial latter asserted that Williams's dispute was filed on November 20, 2023, ECF No. 51-1 at 32, but Patelco has not relied on that date in its briefs or addressed whether it is accurate.  Viewing the record in the light most favorable to Williams for the purpose of Patelco's Motion for Summary Judgment, a reasonable jury could credit Williams's declaration that he disputed the transaction on November 15, 2023.  ECF No. 51-1, ¶ 11, *see also id.* ¶ 13.

27

instead relying on the language of the statute.  Looking to the statutory language, however, this Court agrees with *Bisbey* and *Berenson* that the words "deliver or mail" imply a written a decision. *See* 15 U.S.C. § 1693f(d).

Williams did not receive a written explanation (inexplicably dated March 22, 2023) until May 10, 2024—nearly six months after he submitted his dispute, and 161 calendar days after Patelco denied it on December 1, 2023.  ECF No. 51-1 ¶¶ 26–27 & Ex. E; ECF No. 50-2 at 8.  The Court has not calculated how many of those days were business days, but it does not take precise reckoning to determine that the number is far more than three.  Subpart (d) also requires a financial institution to "include notice of the right to request reproductions with the explanation of its findings," § 1693f(d), which Patelco does not appear to have done, ECF No. 50-2 at 8.

### G.    Bona Fide Error Defense

At least as described by the Ninth Circuit, the EFTA's limitation of a consumer's liability for unauthorized transfers "is subject to two exceptions."  *Widjaja*, 21 F.4th at 582.  As noted above, those pertain to stolen access devices and untimely reporting, and do not apply here.

In a five-sentence section at the end of its Motion, Patelco asserts a different potential exception: the "bona fide error defense under 15 U.S.C. § 1693m(c)."  ECF No. 50-1 at 25–26.[19] That statute provides that "a person may not be held liable in any action brought under this section for a violation of this subchapter if the person shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error" (except with respect to § 1693h, which is not at issue here).  15 U.S.C. § 1693m(c).  Patelco asserts without explanation or citation to evidence that its "policies and procedures are sufficient to establish a bona fide error defense," ECF No. 50-1 at 26, and does not revisit this issue in either its reply brief or its supplemental brief, ECF Nos. 52, 60.

As invoked by Patelco, the good faith error defense would create a third exception to the

---

[19] The heading for this section of Patelco's Motion invokes 15 U.S.C. § 1, which is the Sherman Act's prohibition of any "contract, combination . . . , or conspiracy, in restraint of trade."  15 U.S.C. § 1; *see* ECF No. 50-1 at 25.  The Court presumes that is a typographical error.

United States District Court
Northern District of California

EFTA's limitation of consumer liability for unauthorized transfers beyond the two recognized by the Ninth Circuit in *Widjaja*, allowing consumers to bear the full brunt of such fraudulent transfers so long as a bank maintained reasonable policies. Patelco cites no case so holding. Though the Second Circuit framed the scope of the bona fide error defense broadly in *Newman v. JPMorgan Chase Bank, N.A.*—the only case Patelco cites in this section of its Motion—that non-precedential, out-of-circuit decision concerned circumstances where a bank had ultimately "reimbursed [the plaintiff] the entire outstanding balance" from unauthorized transfers, but the plaintiff sought to hold the bank liable for its initial denial of her claim. *Newman*, No. 24-1914, 2025 WL 3166057, at *1–2 (2d Cir. Nov. 13, 2025). Patelco's Motion does not address the facts of *Newman*, how it applies to this case, or whether it is consistent with Ninth Circuit authority. ECF No. 50-1 at 25–26.

Patelco's conclusory invocation of § 1693m(c) is insufficient to carry its burden of persuasion for summary judgment.[20] Cimarra's failure to identify any specific relevant policies at his deposition, and the apparent lack of any policy documents in the record, reinforce the conclusion that Patelco is not entitled to summary judgment based on such policies and procedures. Summary judgment on that basis is therefore DENIED, without prejudice to the parties addressing the potential relevance of § 1693m(c) in greater detail in the context of motions in limine or jury instructions for trial if Patelco intends to pursue this defense.

### H.    Sanctions for Bad Faith Claim

The EFTA provides for an award of attorney's fees to the defendant if a court determines that "an unsuccessful action under this section was brought in bad faith or for purposes of harassment." 15 U.S.C. § 1693m(f). Patelco seeks such fees in its present Motion, arguing that this action was brought in bad faith because Williams authorized the transaction(s) at issue. ECF No. 50-1 at 25.[21] Because the Court now denies Patelco's Motion on the issue of authorization as

---

[20] Williams's response to this argument, which fails to cite legal authority of any kind, is no better. ECF No. 51 at 21–22. But this is Patelco's Motion, and Patelco has not met its burden.

[21] The heading for this section of Patelco's Motion cites § 1693m(c). ECF No. 50-1 at 25. As discussed above, that subpart concerns the bona fide error defense, not an award of attorneys' fees. The body of Patelco's argument cites the correct subpart (f).

discussed above, Patelco's Motion is also DENIED to the extent it seeks an award of fees under § 1693m(f).

This Order is without prejudice to Patelco seeking fees through a post-trial motion if it prevails at trial. As Patelco itself asserts in its present Motion, "the proper method for seeking attorneys' fees under § 1693m(f) is by motion *after* a resolution on the merits of the underlying EFTA claim." ECF No. 50-1 at 25 (quoting *Bond v. USAA Fed. Sav. Bank*, 11 F. Supp. 3d 940, 942 (D. Minn. 2014)) (emphasis added).

## V.    CONCLUSION

For the reasons discussed above, Patelco's Motion for Summary Judgment is DENIED.

**IT IS SO ORDERED.**

Dated:    April 22, 2026

LISA J. CISNEROS
United States Magistrate Judge

United States District Court
Northern District of California

30